**FILED**

AUG 3 1 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

|  |  |
|---|---|
| **Idah Zirintusa** <br> **5911 16th Street, NW** <br> **Washington, DC 20011** <br><br>    **Plaintiff,** <br><br>    **v.** <br><br> **Rosa Whitaker** <br> **3543 16th Street, NW** <br> **Washington, DC 20010** <br><br>    **and** <br><br> **Pauline Harris** <br> **1616 Decatur Street, NW** <br> **Washington, DC 20011** <br><br>    **Defendants.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

CASE NUMBER  1:05CV01738

JUDGE: Emmet G. Sullivan

DECK TYPE: Labor/ERISA (non-employment)

DATE STAMP: 08/31/2005

*JURY ACTION*

### COMPLAINT

Plaintiff Idah Zirintusa ("Zirintusa"), for her Complaint against Defendants Rosa

Whitaker ("Whitaker") and Pauline Harris ("Harris"), by and through counsel, alleges as follows:

### Nature of the Case

1. Zirintusa is a Ugandan citizen who, for about fifteen years, enjoyed a well-paid

job as member of the President of Uganda's staff, most recently as a Catering Officer.  The job

not only afforded Zirintusa the means to support her two biological children, five adopted

children, and ailing mother, but moreover provided, among other things, free government

housing where Zirintusa and her family could live together, complete medical coverage for the

entire family, and a scholarship for one of Zirintusa's most gifted children.  Whitaker, a former

Assistant U.S. Trade Representative to Africa in the Clinton and Bush administrations, destroyed all that.

2.      In 2002, when Whitaker visited the President of Uganda, Zirintusa volunteered to serve as Whitaker's personal valet. Thereafter, Whitaker tried to lure Zirintusa to Washington, D.C., to work for Whitaker in a domestic position. During the next two years, Whitaker repeatedly made Zirintusa generous employment offers that, on information and belief, Whitaker never intended to honor fully. Unwilling to leave her high-quality job and her family, Zirintusa continued to refuse Whitaker's offers. Whitaker then raised the issue directly with Zirintusa's superiors in the Ugandan State House. As a result, Uganda State House officials informed Zirintusa that she would be "allowed" to work in the United States and that she would not be able to return to her job once she left. Zirintusa understood, based on her years on the President's staff and Ugandan culture, that her position was being terminated as a direct result of Whitaker's intervention with Zirintusa's employer.

3.      With little choice, Zirintusa accepted a three-year contract with Whitaker. During the term of the contact, Zirintusa was to work for Whitaker in a domestic position in Washington, D.C., in exchange for, among other things, full tuition at a U.S. college, a salary equal to four times what Zirintusa had earned in Uganda, food and shelter, health care, and separate payments sufficient to support Zirintusa's family and privately educate her children, who would remain in Uganda.

4.      Although Whitaker had engaged Zirintusa as a domestic worker, Whitaker arranged to bring Zirintusa to the United States on a student visa. To sponsor Zirintusa's student visa, Whitaker signed, and submitted to the U.S. Department of Justice, Immigration and Naturalization Service, an Affidavit of Support, notarized on December 22, 2003. In the

2

Affidavit of Support, Whitaker contractually agreed to provide Zirintusa with $23,000 per year for a period of three years, to cover Zirintusa's tuition, food, shelter, and related expenses.

5.     Relying on Whitaker's promises, Zirintusa separated from her family and sent them to live with various friends and relatives in Uganda, sold or gave away most of her possessions at a significant loss, and moved to the United States. When Zirintusa arrived in Washington, D.C., little was as Whitaker had promised.

6.     Zirintusa began to work for Whitaker at Whitaker's Washington, D.C. home on August 18, 2004. During the 19 weeks that Zirintusa worked for Whitaker, Zirintusa fully performed her contractual obligations, but Whitaker breached her obligation to provide support for Zirintusa's family, failed to provide for Zirintusa's food and health care, and subtracted money from Zirintusa's base pay. Zirintusa worked an estimated 348 hours of overtime, including an estimated 118 hours for Whitaker and an estimated 230 hours for Whitaker's friend Harris, for which Zirintusa received no compensation. Nor was the pay that Zirintusa received sufficient to meet federal and Washington, D.C. minimum wage requirements.

7.     When Zirintusa complained to Whitaker about her poor pay and working conditions, Whitaker retaliated by terminating Zirintusa without lawful cause on December 24, 2004. Thereafter, Whitaker ceased providing Zirintusa with any benefits pursuant to their contract and in derogation of the Affidavit of Support that Whitaker had signed.

8.     Consequently, Zirintusa seeks to recover compensatory and punitive damages for Whitaker's breach of her contractual obligations, Whitaker's tortious interference with Zirintusa's contract with the government of Uganda, and Whitaker's fraudulent misrepresentations that induced Zirintusa to come to the United States. Zirintusa further brings this action for compensatory, liquidated and punitive damages pursuant to the Fair Labor

3

Standards Act, 21 U.S.C. §§ 215(a), 216(b), the District of Columbia Payment and Collection of

Wages Law, D.C. Code § 32-1301, et seq., the District of Columbia Minimum Wage Act

Revision Act of 1992, D.C. Code §36.220-1, et seq. (1993).

### The Parties

9.      Plaintiff Zirintusa is a citizen of Uganda who lawfully resides in the United States

pursuant to a student visa. Zirintusa currently is enrolled in Montgomery Community College in

Takoma Park, Maryland ("Montgomery College"). Since being terminated by Whitaker in

December 2004, Zirintusa has been staying with various friends in the Washington, D.C. area.

10.     Defendant Whitaker resides in the District of Columbia and, on information and

belief, is a U.S. citizen. Whitaker was selected by President Clinton to be the Assistant U.S.

Trade Representative for Africa in 1998. In 2001, President Bush retained her services. During

her tenure with the U.S. government, Whitaker formed personal and business relationships with

African leaders, including Uganda's President, Yoweri K. Museveni ("President Museveni").

Whitaker remained in her Assistant U.S. Trade Representative position until 2002, when she left

to found The Whitaker Group, a Washington, D.C.-based consulting firm with a focus on

African development. Whitaker currently is the President and CEO of The Whitaker Group.

11.     Defendant Harris is a resident of the District of Columbia and, on information and

belief, is a U.S. citizen. Harris is a personal friend of Whitaker. At the direction of Harris and

Whitaker, Zirintusa worked in Harris' Washington, D.C. home, typically for one 12-hour day

each week, until Zirintusa's position was terminated in December 2004. On information and

belief, Whitaker received payment from Harris for Zirintusa's services.

### Jurisdiction and Venue

12.     This Court has subject matter jurisdiction pursuant to the Fair Labor Standards

Act, 21 U.S.C. § 216(b), and 28 U.S.C. § 1331.

13.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over claims arising under District of Columbia law, including claims under D.C. Code § 32-1301, et seq., and D.C. Code §32-1001, et seq., as well as common law claims for breach of contract, unjust enrichment, tortious interference with contract, tortious interference with prospective advantage, and fraud.

14.    Whitaker and Harris reside in the District of Columbia and a substantial part of the events or omissions giving rise to the claim occurred within the District of Columbia.

15.    Venue is proper pursuant to 28 U.S.C. § 1391(b) and 21 U.S.C. § 216(b).

## Statement of Facts

### A.    Zirintusa Had a Fulfilling Job That Allowed Her To Support Her Family.

16.    Zirintusa was born in Uganda in 1964.  After graduating from college, Zirintusa became a principal caretaker for her family, including her ailing, elderly mother, two of her children and five of her relatives' children.  To support them, Zirintusa worked for the Uganda State House, the residence of the President of Uganda, from 1989 to 2004.  Zirintusa's most recent position in the Uganda State House was as a Catering Officer.  In that position, Zirintusa supervised junior staff members and traveled throughout Uganda with President Museveni and his wife.

17.    As a Catering Officer, Zirintusa earned a base salary, plus a per diem sum when traveling with President Museveni.  Further, Zirintusa received a benefits package, worth an estimated $2,500 per month, that included, among other things: (1) permanent housing for Zirintusa and her family; (2) health insurance for Zirintusa and her family; (3) Zirintusa's food and shelter during work-related travel; (4) holiday bonuses; (5) transportation and commuter allowances; (6) free use of a government car and telephone services; and (7) a scholarship for

one of Zirintusa's children to attend a prestigious Ugandan private school. Zirintusa's job also afforded her intangible benefits, including reputation and status in her community.

18.    On a regular basis, Zirintusa signed renewed employment agreements with the Ugandan State House. On information and belief, the employment agreements between Zirintusa and the Uganda State House were for a term of years and Zirintusa was not an at-will employee of the Uganda State House.

**B.    Whitaker Tries to Lure Zirintusa to Washington, D.C.**

19.    In or around September 2002, Whitaker visited one of President Museveni's country homes. When Zirintusa learned that Whitaker needed a female personal attendant, Zirintusa, as the only female staff present, volunteered. Upon Whitaker's request, Zirintusa also provided other assistance and companionship to Whitaker during her visit. Whitaker commented on Zirintusa's strong work ethic and asked Zirintusa about her family in Uganda.

20.    In or about January 2003, when Whitaker returned to Uganda to visit President Museveni, Whitaker expressed to Zirintusa's superiors an interest in hiring Zirintusa to work for Whitaker in Washington, D.C. Shortly thereafter, Whitaker called Zirintusa and made her an offer of employment. Zirintusa refused the offer, citing her good job in Uganda and the need to care for her family.

21.    In response to Zirintusa's concerns, Whitaker made an improved offer of employment, for a period of three years, on terms that included: (1) four times the wages that Zirintusa earned in her current position; (2) full tuition at a U.S. college; (3) food, shelter, and health care in the United States; (4) separate payments to support Zirintusa's family that would be sufficient to provide them with food, shelter, and medical care, comparable to what Zirintusa received from the Uganda State House, plus school tuition for the minor children in Zirintusa's

care. Upon information and belief, Whitaker never intended to make any payments to support Zirintusa's family. Whitaker's promise to make such payments was a false statement of material fact.

22.    Zirintusa did not accept Whitaker's offer at that time. In or around September 2003, during another of Whitaker's visits, Whitaker renewed her offer on the same terms. In doing so, Whitaker once again promised to make payments to support Zirintusa's family despite the fact that, on information and belief, Whitaker never intended to honor her promises. Once again, Zirintusa did not accept the offer.

**C.    Whitaker Causes Zirintusa's Termination.**

23.    In or around February 2004, Whitaker returned to visit the Uganda State House. Upon information and belief, Whitaker approached President Museveni and his wife as well as other Uganda State House officials to discuss Whitaker's desire to employ Zirintusa in Washington, D.C. Shortly thereafter, Zirintusa learned from Ugandan State House officials that she was "allowed" to work in the United States and that she would not be able to return to her job once she left. Zirintusa understood – based on her years on President Museveni's staff and Ugandan culture – that her position with the Uganda State House would be terminated and that she was expected to accept Whitaker's offer. Zirintusa's termination was a direct result of Whitaker's intervention with her employer.

24.    In June 2004, Zirintusa left her position with the Uganda State House pursuant to an agreement under which she would not be able to seek renewed employment there for three years, i.e., after her contract with Whitaker had been completed. A new employee filled Zirintusa's position at the Uganda State House shortly after she departed.

25.    Left with little choice, Zirintusa accepted Whitaker's offer of employment on the terms that Whitaker had most recently proposed. In so doing, Zirintusa detrimentally and justifiably relied on Whitaker's false promises to provide support for Zirintusa's family.

**D.    Whitaker Makes Arrangements for Zirintusa to Come to Washington, D.C.**

26.    Upon reaching an agreement with Zirintusa, Whitaker arranged for Zirintusa to come to the United States on a student visa. Accordingly, Zirintusa, acting upon Whitaker's instructions and with Whitaker's assistance, completed an application to attend school at Montgomery College and, in June 2004, applied for a U.S. student visa with Whitaker as her sponsor.

27.    To sponsor Zirintusa's student visa, Whitaker signed, and submitted to the U.S. Department of Justice, Immigration and Naturalization Service, an Affidavit of Support, notarized on December 22, 2003. In the Affidavit of Support, Whitaker contractually agreed to provide Zirintusa with $23,000 per year for a period of three years, to cover Zirintusa's tuition, food, shelter, and related expenses.

28.    In July 2004, Whitaker returned to Uganda and provided Zirintusa with funds to reimburse Zirintusa for her visa application costs. In response to Zirintusa's concerns that Whitaker had not yet provided sufficient funds to care for Zirintusa's family, Whitaker once again promised Zirintusa that upon Zirintusa's arrival in the United States, Whitaker would make separate payments to support Zirintusa's family that would be sufficient to provide them with food, shelter, and medical care, comparable to what Zirintusa had received from the Uganda State House, plus school tuition for the minor children in Zirintusa's care. These promises were false statements of material fact and, upon information and belief, Whitaker had no intention of honoring them.

29.     In early August 2004, reasonably relying on Whitaker's promises (including Whitaker's often-repeated but materially false representation that Whitaker would make separate payments to support Zirintusa's family), Zirintusa paid her children's tuition fees for the Fall 2004 semester and, in preparation for her impending move, gave away or sold most of her possessions at a significant loss. Moreover, she divided her family and sent them to live with various friends and relatives throughout Uganda.

**F.     Zirintusa Works for Whitaker, Who Fails to Pay the Minimum Wage and Overtime Compensation and Fails to Honor Her Contractual Obligations, and Harris, Who Fails to Pay Her Any Compensation.**

30.     Zirintusa worked for Whitaker and Harris in Washington, D.C. from August 19, 2004 through December 24, 2004. During this time, Zirintusa was at all relevant times subject to Whitaker's management, supervision and control with regard to her work. Zirintusa was subject to Harris' management, supervision and control with regard to her work at Harris' home.

31.     On or about August 18, 2004, Zirintusa arrived in the United States and moved into Whitaker's Washington, D.C. home. The next day, Whitaker instructed Zirintusa to begin performing domestic tasks. Whitaker instructed Zirintusa about her responsibilities, which included, among other things, providing Whitaker's breakfast in bed, preparing snacks, scrubbing the bathroom, cleaning the bedroom, taking out the garbage, and purchasing and transporting Whitaker's groceries by bus.

32.     The next week, Whitaker escorted Zirintusa to the residence of Whitaker's friend, Harris, in the Kalorama district of Washington, D.C., where Zirintusa spent 14 hours performing domestic tasks. Whitaker instructed Zirintusa that Zirintusa was required to clean Harris' house on a weekly basis. Thereafter, Zirintusa spent on average one 12-hour day each week cleaning Harris' house to Harris' exacting standards. On several occasions, Harris, acting without cause

or provocation, berated Zirintusa at length while Zirintusa was cleaning. Upon information and belief, Harris paid Whitaker for Zirintusa's services. Zirintusa never received any payment from Harris.

33.    Around this time, Whitaker stated to Zirintusa that Zirintusa's salary would be $800 per month, in contravention of Whitaker's earlier promises. Whitaker paid Zirintusa $400 for Zirintusa's work in the latter half of August, and subsequently paid Zirintusa between $600 and $750 per month for September, October, November, and December 2004. Whitaker explained that she was deducting the costs of Zirintusa's phone bill from Zirintusa's monthly pay, despite having represented to Zirintusa that Zirintusa was welcome to use the phone for calls to her family and without ever showing Zirintusa the phone bills. Whitaker also subtracted $100 from Zirintusa's November pay, supposedly, according to Whitaker, because Zirintusa missed a day cleaning Harris' house.

34.    During the time that Zirintusa was employed by Whitaker, Zirintusa worked 17 weeks in which she worked an estimated 60 hours per week or more – typically six 8-hour days for Whitaker plus one 12-hour day for Harris. In all, Zirintusa worked an estimated 348 hours of overtime, including an estimated 230 hours cleaning the Harris house. At no point did Whitaker or Harris pay Zirintusa any compensation for the overtime hours.

35.    Further, Whitaker failed to pay for Whitaker's food and health care. Whitaker also failed make any payments whatsoever to support Zirintusa's family, in derogation of Whitaker's contractual duty to do so.

G.    **Whitaker Terminates Zirintusa Without Lawful Cause, In Retaliation for Zirintusa's Complaints.**

36.    Zirintusa complained to Whitaker that she was unhappy that Whitaker was not fulfilling her promises to Zirintusa, not paying Zirintusa an adequate wage, not providing

10

sufficiently for Zirintusa's food, and not honoring her obligations to provide support for

Zirintusa's family. Further, despite Zirintusa's long work hours, Zirintusa was attending school

full time at Montgomery College, something Whitaker disliked (and pressured Zirintusa to scale

back) because it cut into Zirintusa's time to perform domestic work, despite the fact that such

school attendance was the basis for Zirintusa's visa.

37.    On information and belief, Whitaker decided to retaliate against Zirintusa for her

complaints and opposition to Whitaker's unlawful treatment of her.

38.    On information and belief, Whitaker was concerned that once she terminated

Zirintusa, Zirintusa would complain publicly about Whitaker's mistreatment or take legal action

against Whitaker. Accordingly, on information and belief, Whitaker decided to create a paper

record that might be helpful to Whitaker in the event that her actions were questioned.

39.    On or about December 18, 2004, Sheila Williams ("Williams") – who is

Whitaker's sister and Chief of Staff for The Whitaker Group – met with Zirintusa. At the

meeting, Williams presented Zirintusa with a document Zirintusa had not seen before, titled "The

Whitaker Group Scholarship Participation Form." The document stated that Zirintusa was

"interested in participating in The Whitaker Group's Scholarship Program." The document was

backdated to show a "Date Accepted" of April 21, 2004. In fact, however, Zirintusa did not

come to the United States pursuant to a bona fide scholarship program; she came pursuant to her

contract with Whitaker. At Williams' direction, Zirintusa signed the document.

40.    On December 24, 2004, Williams again met with Zirintusa and told Zirintusa that

she was terminated, effective immediately. Whitaker did not have any cause to fire Zirintusa and

Williams did not say that Zirintusa was being terminated for cause. At Williams' direction,

Zirintusa signed another document stating that Zirintusa declined to accept a return ticket to

11

Uganda and a $1,500 "resettlement sum," and that Zirintusa had decided to remain in the United States and to "identify an alternative financial sponsor." Subsequently, Zirintusa received no further contractual benefits from Whitaker.

41.    On information and belief, Whitaker terminated Zirintusa in retaliation for Zirintusa's complaints about her pay and working conditions.

## COUNT ONE
### (Breach of Contract – Employment Agreement)
### (Against Defendant Whitaker)

42.    Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 41 above.

43.    In 2004, Zirintusa and Whitaker entered into a three-year contract pursuant to which, Whitaker, for the term of the contract, was obligated to provide Zirintusa: (1) four times the wages that Zirintusa earned in her current position; (2) full tuition at a U.S. college; (3) food, shelter, and health care in the United States; (4) separate payments to support Zirintusa's family that would be sufficient to provide them with food, shelter, and medical care, comparable to what Zirintusa received from the Uganda State House, plus school tuition for the minor children in Zirintusa's care.

44.    Zirintusa detrimentally relied on these promises by, among other things, selling her possessions at a loss and moving to the United States, away from her family, and working for Whitaker and Harris.

45.    During the time that Zirintusa worked for Whitaker, Whitaker breached the contract by failing to make payments (1) representing four times the wages that Zirintusa earned at the Uganda State House; (2) for Zirintusa's food and health care; and (3) separate payments to support Zirintusa's family that would be sufficient to provide them with food, shelter, and

medical care comparable to what Zirintusa received from the Uganda State House, plus school tuition for the minor children in Zirintusa's care.

46.    Subsequently, Whitaker breached the contract by terminating Zirintusa without lawful cause before her three-year term of employment had expired, and thereafter failing to provide any contractual benefits to Zirintusa.

47.    Whitaker's breaches caused Zirintusa to suffer damages.

WHEREFORE, Zirintusa respectfully requests this Court to enter judgment against Whitaker in the amount to be proven at trial, plus prejudgment interest, plus any consequential damages.

## COUNT TWO
### (Breach of Contract – Sponsorship Affidavit)
### (Against Defendant Whitaker)

48.    Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 41 above.

49.    In December 2003, Whitaker signed an Affidavit of Sponsorship that obligated her to provide Zirintusa with support in the amount of $23,000 per year, for a period of three years, to cover Zirintusa's tuition and fees, books and supplies, and living expenses.

50.    Whitaker breached that contract by failing to pay Zirintusa the full sponsorship amount in 2004 and by refusing to pay any sponsorship benefits to Zirintusa after December 2004.

51.    Whitaker's breach has caused Zirintusa to suffer damages.

WHEREFORE, Zirintusa respectfully requests this Court to enter judgment against Whitaker in the amount to be proven at trial, plus prejudgment interest, plus any consequential damages.

## COUNT THREE
### (Minimum Wage Violations under the FLSA, 29 U.S.C. § 206)
### (Against Defendants Whitaker and Harris)

52.     Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 41 above.

53.     Whitaker employed Zirintusa.  Zirintusa worked for Whitaker for more than 8 hours in the aggregate each workweek, including work performed outside of Whitaker's household.

54.     Harris was a joint employer of Zirintusa because she controlled the work Zirintusa performed at Harris' home.  Zirintusa worked for Harris for more than 8 hours in the aggregate each workweek.

55.     During her employment with Whitaker from August 18, 2004 through December 24, 2004, Zirintusa worked over 40 hours per week for 17 weeks, and received compensation below the $5.15 per hour required by the federal minimum wage provisions.

56.     During her employment with Harris from August 18, 2004 through December 24, 2004, Zirintusa worked for approximately 12 hours per week for 17 weeks, and did not receive compensation.

57.     As a result of Whitaker's violations, Zirintusa has suffered damages.

58.     As a result of Harris' violations, Zirintusa has suffered damages.

59.     FLSA authorizes punitive damages and attorneys' fees in actions to recover minimum wage.

WHEREFORE, Zirintusa respectfully demands judgment against Whitaker and Harris and requests that the Court award damages in the amount to be proven at trial, plus liquidated

damages in an equal amount, plus applicable interest, late fees, costs, and reasonable attorney's fees.

## COUNT FOUR
### (Overtime Compensation Violations under the FLSA, 29 U.S.C. § 207)
### (Against Defendants Harris and Whitaker)

60.    Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 41 above.

61.    Zirintusa worked and resided in Whitaker's household.  Zirintusa regularly worked outside of the house, including, but not limited to, cleaning the house of Harris.

62.    During her employment for Whitaker and Harris, from at least August 21, 2004 until December 24, 2004, Zirintusa was a non-exempt employee of Whitaker for the purposes of Section 207 of the FLSA, and therefore was entitled to overtime pay for any hours over 40 worked in a week.

63.    Zirintusa worked in excess of 40 hours per week for 17 weeks during the employment period, but was never paid overtime wages.

64.    Whitaker was aware of Zirintusa's work schedule or reasonably should have been aware of it, and should not have permitted her to work the overtime hours without compensation. On information and belief, Harris was aware of Zirintusa's work schedule or reasonably should have been aware of it, and should not have permitted her to work the overtime hours without compensation.

65.    Whitaker's failure to pay wages to Zirintusa for each hour that she worked was a willful and intentional violation of the FLSA, such that Zirintusa is entitled to recover overtime pay from Whitaker for the period in question.

66.    On information and belief, Harris' failure to pay wages for Zirintusa for each hour that she worked was a willful and intentional violation of the FLSA, such that Zirintusa is entitled to recover overtime pay from Harris for the period in question.

WHEREFORE, Zirintusa respectfully requests that the Court enter a judgment against Whitaker and Harris for violations of the FLSA, 29 U.S.C. §§ 201 et seq., and §§ 215 et seq., in the amount to be proven at trial, together with liquidated damages in an equal amount, plus prejudgment interest, plus attorney's fees and the costs of this action.

**COUNT FIVE**
**(Retaliation under the FLSA, 29 U.S.C. § 215(a))**
**(Against Defendant Whitaker)**

67.    Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 41 above.

68.    Zirintusa engaged in a protected activity by complaining to Whitaker about her pay and working conditions, including Whitaker's failure to compensate Zirintusa adequately.

69.    Whitaker terminated Zirintusa. On information and belief, Whitaker did so as a reprisal for Zirintusa having engaged in the protected activity described in paragraph 68 above.

WHEREFORE, Zirintusa respectfully requests that the Court enter a judgment against Whitaker violations of the FLSA, 29 U.S.C. §§ 201 et seq., and §§ 215 et seq., in the amount to be proven at trial, together with liquidated damages in an equal amount, plus prejudgment interest, plus attorney's fees and the costs of this action.

## COUNT SIX
**(Violations of D.C. Payment and Collection of Wages Law, D.C. Code. Ann., § 32-1303)**
**(Against Defendants Whitaker and Harris)**

70.    Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 41 above.

71.    Whitaker failed to pay Zirintusa the outstanding wages and overtime wages to which she is entitled on the date of termination, December 24, 2004, or within 4 days from the date of termination.

72.    Harris failed to pay Zirintusa the required wage for each hour that Zirintusa worked in Harris' residence.

73.    The failure on the part of the Whitaker and Harris to pay Zirintusa wages to which she was entitled by December 28, 2004 is a violation of the District of Columbia Payment and Collection of Wages Law, D.C. Code Ann., § 32-1303.

74.    The District of Columbia law authorizes liquidated damages, plus costs and attorney's fees for a violation of the District of Columbia Payment and Collection of Wages Law.

WHEREFORE, Zirintusa respectfully requests that the Court enter judgment against Whitaker and Harris in the amount to be proven at trial, plus liquidated damages in an equal amount, plus applicable interest, attorney's fees and costs of this action.

## COUNT SEVEN
**(Violations of the D.C. Minimum Wage Act Revision Act of 1992,**
**formerly D.C. Code. Ann. §§ 36.220-1 and 36.220-2 (1993))**
**(Against Defendants Harris and Whitaker)**

75.    Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 41 above.

76.    Zirintusa worked in excess of 40 hours per week for 17 weeks during the period from August 18, 2004 to December 24, 2004, but was not paid either the D.C. minimum wage (applicable at the time) of $6.15, or the minimum overtime wage (applicable at the time) of at least $9.23 for the hours worked in excess of 40 per week.

77.    Whitaker was aware or should have been aware of Zirintusa's work schedule and permitted her to work those hours. On information and belief, Harris was aware or should have been aware of Zirintusa's work schedule and permitted her to work those hours.

78.    Whitaker's failure to pay Zirintusa the overtime wages to which she was entitled is a violation of the District of Columbia Minimum Wage Act Revision Act of 1992, D.C. Code Ann., §§ 36.220-1 and 36.220-2 (1993), which was in force at the time.

79.    Harris's failure to pay Zirintusa any of the wages to which she was entitled is a violation of the District of Columbia Minimum Wage Act Revision Act of 1992, D.C. Code Ann., §§ 36.220-1 and 36.220-2 (1993), which was in force at the time.

80.    Whitaker's failure to pay overtime to Zirintusa was a willful and intentional violation of the D.C. Minimum Wage Act Revision Act of 1992, such that Zirintusa is entitled to recover overtime pay from Whitaker for the employment period in question.

81.    On information and belief, Harris' failure to pay overtime to Zirintusa was a willful and intentional violation of the D.C. Minimum Wage Act Revision Act of 1992, such that Zirintusa is entitled to recover overtime pay from Harris for the employment period in question.

82.    The District of Columbia authorizes liquidated damages plus costs and attorney's fees for violations set forth in this Count.

WHEREFORE, Zirintusa respectfully requests judgment against Whitaker and Harris in the amount to be proven at trial, plus liquidated damages in an equal amount, plus prejudgment interest, plus attorney's fees and the costs of this action.

## COUNT EIGHT
### (Tortious Interference with Contract)
### (Against Defendant Whitaker)

83.    Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 41 above.

84.    Zirintusa had a contract for employment with the Uganda State House.  Upon information and belief, the contract was for a term of years and was not a contract for at-will employment.

85.    Whitaker knew that Zirintusa had a contract for employment with the Uganda State House.

86.    Whitaker intentionally interfered with Zirintusa's contractual relationship by, on information and belief, exerting her influence on Zirintusa's superiors at the Ugandan State House.

87.    Whitaker's actions led to the termination of Zirintusa's employment relationship with the Uganda State House.

88.    Whitaker's actions caused Zirintusa to suffer damages.

89.    Whitaker's actions were willful, wanton, and malicious.

WHEREFORE, Zirintusa respectfully requests this Court to enter judgment against Whitaker in the amount to be proven at trial, plus punitive damages, plus prejudgment interest, plus attorney's fees and the costs of this action.

## COUNT NINE
### (Tortious Interference with Prospective Advantage)
### (Against Defendant Whitaker)

90.    Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 41 above.

91.    Zirintusa was in a valid business relationship with her employer, the State House of Uganda, which extended beyond her contract for employment to certain fringe benefits. Zirintusa had the expectancy of the continuation of these benefits.

92.    Whitaker knew that Zirintusa had a valid business relationship with the State House and the expectancy of continued benefits from the State House.

93.    Despite such knowledge, Whitaker intentionally interfered with this relationship and this expectancy by, on information and belief, influencing the Uganda State House regarding Zirintusa's employment, thereby causing the end of both the business relationship and the expectancy of continued benefits.

94.    Whitaker's actions caused Zirintusa to suffer damages.

95.    Whitaker's actions were willful, wanton, and malicious.

WHEREFORE, Zirintusa respectfully requests this Court to enter judgment against Whitaker in the amount to be proven at trial, plus punitive damages, plus prejudgment interest, plus attorney's fees and the costs of this action.

## COUNT TEN
### (Fraud)
### (Against Defendant Whitaker)

96.    Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 41 above.

97.    Whitaker made material misstatements of fact in January 2003, September 2003, and July 2004, when she falsely promised Zirintusa that if Zirintusa accepted Whitaker's offer of employment, Whitaker would provide payments for the care and support of Zirintusa's family in Uganda.

98.    At the time Whitaker made these misrepresentations, on information and belief, she knew that they were false and did not intend to honor her promises.

99.    On information and belief, Whitaker made these misrepresentations for the purpose of inducing Zirintusa to rely upon them.

100.    Zirintusa reasonably and justifiably relied on Whitaker's misstatements, sold her possessions at a significant loss, left her family in Uganda, and came to work for Whitaker in the United States.

101.    Whitaker's misstatements caused Zirintusa to suffer damages.

102.    Whitaker's actions were willful, wanton, and malicious.

WHEREFORE, Zirintusa respectfully requests this Court to enter judgment against Whitaker in the amount to be proven at trial, plus punitive damages, plus prejudgment interest.

## COUNT ELEVEN
### (Unjust Enrichment)
### (Against Defendants Whitaker and Harris)

103.    Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 41 above.

104.    Whitaker received a benefit at Zirintusa's expense when Whitaker accepted Zirintusa's domestic services without paying Zirintusa full compensation for the value of those services.

105.    Whitaker also received a benefit at Zirintusa's expense when, on information and belief, Whitaker accepted payments from Harris for domestic services Zirintusa performed for Harris, without compensating Zirintusa for those services.

106.    Under the circumstances, it would be unjust for Whitaker to retain the benefit of Zirintusa's services both to Whitaker and to Harris without paying for their full value.

107.    Harris received a benefit at Zirintusa's expense when Harris accepted Zirintusa's domestic services without compensating Zirintusa for those services.

108.    Principles of equity therefore entitle Zirintusa to disgorge from Whitaker the benefit of the unpaid-for portion of Zirintusa's services to Whitaker, i.e., the actual value of the services Zirintusa rendered to Whitaker, measured by the D.C. minimum wage then applicable of $6.15 per hour (taking into account unpaid overtime wages then applicable of $9.23 per hour), less the amount Whitaker already paid Zirintusa for those services.

109.    Principles of equity also entitle Zirintusa to disgorge from Whitaker the benefit Whitaker received from Zirintusa's services to Harris, i.e., the amount actually paid to Whitaker by Harris for Zirintusa's services to Harris.

110.    Principals of equity also entitled Zirintusa to disgorge from Harris the benefit of the unpaid-for portion of Zirintusa's services to Harris, i.e., the actual value of the services Zirintusa rendered to Harris, measured by the D.C. minimum wage then applicable of $6.15 per hour (taking into account unpaid overtime wages then applicable of $9.23 per hour).

WHEREFORE, Zirintusa respectfully requests this Court to enter judgment against Whitaker and Harris in the amount to be proven at trial, plus prejudgment interest.

## DEMAND FOR JURY TRIAL

Zirintusa demands a jury trial as to all issues.

Dated: August 31, 2005

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

Christine N. Kearns, Esq. (DC Bar No. 416339)
Alex C. Lakatos, Esq. (DC Bar No. 453763)
2300 N Street N.W.
Washington, DC 20037-1128
United States of America
Telephone: (202) 663-8693
Facsimile: (202) 663-8007
E-mail: Alex.Lakatos@pillsburylaw.com

Kerri Sherlock, Esq. (DC Bar No. 480873)
Break The Chain Campaign
733 15th Street NW
Washington, DC 20005
Telephone: (202) 787-5245
Facsimile: (202) 387-7915
E-mail: kerri@ips-dc.org

*Counsel for Plaintiff Idah Zirintusa*