

**Pillsbury
Winthrop
Shaw
Pittman** LLP

2300 N Street, N.W.  
Washington, D.C. 20037-1128

Tel  202.663.8000  
Fax  202.663.8007  
www.pillsburylaw.com

July 1, 2005

Alex C. Lakatos  
202.663.8693  
alex.lakatos@pillsburylaw.com

By Hand Delivery

Rosa Whitaker  
1725 I Street NW  
Suite 300  
Washington, DC 20006

Re:    **Idah Zirintusa**

Dear Ms. Whitaker:

Our firm represents Idah Zirintusa in connection with her claims against you arising from, among other things, your tortious actions that caused the Uganda State House effectively to terminate Ms. Zirintusa's employment and that fraudulently induced Ms. Zirintusa to accept employment with you in the United States, your subsequent breach of your contractual obligations to Ms. Zirintusa, and your failure to honor federal and Washington, D.C. minimum wage and fair labor standards laws.

As you are aware, during your numerous visits to Uganda, you induced Ms. Zirintusa to accept employment with you in the United States by making misrepresentations to her. You promised Ms. Zirintusa, among other things, that you would provide a substantial salary increase, financial support for Ms. Zirintusa's mother and children who would remain in Uganda, and significant benefits including tuition at a U.S. college during a three-year course of study. Ms. Zirintusa accepted your offer only after you – based on the close relationship that you had formed with Uganda's President during your service as an Assistant U.S. Trade Representative to Africa – caused the Uganda State House effectively to terminate Ms. Zirintusa's employment.

Thereafter, in reliance on your false promises, Ms. Zirintusa sold her possessions, sent her minor children and ailing mother to live with various friends and relatives in Uganda, and moved to Washington, D.C. to begin working for you. Upon her arrival, however, you failed to honor fully your promises. Instead, you required Ms. Zirintusa to perform domestic work for you and your friend Pauline Harris for compensation that was vastly below legal requirements. Ultimately, you terminated Ms. Zirintusa without cause and before her three-year contract with you had expired.

Rosa Whitaker
July 1, 2005
Page 2

We understand that you failed to respond substantively to a February 11, 2005, offer from Kerri Sherlock, Ms. Zirintusa's counsel at Break the Chain Foundation, to resolve this matter amicably. Accordingly, Ms. Zirintusa has engaged us to represent her. The opportunity for a resolution settlement remains open. To facilitate that process, we have enclosed a draft of Ms. Zirintusa's complaint against you for your review. If we have not received a satisfactory response from you by July 11, 2005, our client has authorized us to file suit against you. In addition, please be advised that we have contacted a public relations firm that will assist Ms. Zirintusa in the event the matter is not resolved amicably.

Sincerely,

*[signature]*

Alex C. Lakatos

Enclosure

cc: Kerri Sherlock, Esq. (with enclosure)
    Idah Zirintusa (with enclosure)

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| Idah Zirintusa<br>5911 16th St. NW<br>Washington DC 20011<br><br>        Plaintiff,<br><br>        v.<br><br>Rosa Whitaker<br>1725 I Street NW<br>Suite 300<br>Washington, DC 20006<br><br>        Defendant. | Civil Action No. _____ |

## COMPLAINT

Plaintiff Idah Zirintusa ("Zirintusa"), for her Complaint against Defendant Rosa Whitaker ("Whitaker"), by and through counsel, alleges as follows:

### Nature of the Case

1. Zirintusa is a Ugandan citizen who, for about fifteen years, enjoyed a good job as member of the President of Uganda's staff, most recently as a Catering Officer. The job not only afforded Zirintusa the means to support seven children and her ailing mother, but moreover provided, among other things, free government housing where Zirintusa and her family could live together, complete medical coverage for the entire family, and a scholarship for one of Zirintusa's most gifted children. Whitaker, a former Assistant U.S. Trade Representative to Africa in the Clinton and Bush administrations, ruined all that.

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

2.  In 2002, when Whitaker visited the President of Uganda, Zirintusa volunteered to serve as Whitaker's personal valet. Thereafter, Whitaker tried to lure Zirintusa to Washington, D.C., to work for Whitaker in a domestic position. During the next two years, Whitaker made Zirintusa generous employment offers that, on information and belief, Whitaker never intended to honor fully. When Zirintusa continued to refuse Whitaker's offers, Whitaker raised the issue directly with the President of Uganda and his wife. As a result, Zirintusa learned that the Ugandan President had "authorized" Zirintusa to work for Whitaker, and expected Zirintusa to accept the job. Zirintusa understood, based on her years on the President's staff and Ugandan culture, that her position was being terminated.

3.  With little choice, Zirintusa accepted a three-year employment contract with Whitaker. During the term of the contact, Zirintusa was to work for Whitaker in a domestic position in Washington, D.C., in exchange for, among other things, a salary equal to four times what Zirintusa had earned in Uganda, tuition at a U.S. college, room and board, health care, and separate payments sufficient to support Zirintusa's family and privately educate her children, who would remain in Uganda. Relying on Whitaker's promises, Zirintusa broke apart her family and sent them to live with various friends and relatives in Uganda, sold most of her possessions at a significant loss, and moved to the United States. When Zirintusa arrived in Washington, D.C., little was as Whitaker had promised.

4.  Zirintusa began to work for Whitaker at Whitaker's Washington, D.C. home on August 18, 2004. Zirintusa fully performed her contractual obligations until December 24, 2004, when Whitaker fired Zirintusa without cause and ceased providing Zirintusa with any benefits pursuant to their contract. During the 19 weeks that Zirintusa worked for Whitaker, Whitaker breached her obligation to provide support for Zirintusa's family, failed to provide for Zirintusa's

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

board and health care, and found ways to subtract money from Zirintusa's base pay, such as charging for phone calls. Moreover, Zirintusa worked an estimated 348 hours of overtime (including an estimated 230 hours of overtime in a home that belonged to one of Whitaker's friends), for which Zirintusa received no additional compensation. Nor was the pay that Zirintusa received sufficient to meet federal and Washington, D.C. minimum wage requirements.

5. Consequently, Zirintusa brings this action for compensatory, liquidated and punitive damages pursuant to the Fair Labor Standards Act, 21 U.S.C. § 216(b), the District of Columbia Payment and Collection of Wages Law, D.C. Code § 32-1301, et seq., and the District of Columbia Minimum Wage Act Revision Act of 1992, D.C. Code §36.220-1, et seq. (1993). In addition, Zirintusa seeks to recover compensatory and punitive damages for Whitaker's tortious interference with Zirintusa's contract and prospective advantage with the government of Uganda, Whitaker's fraudulent misrepresentations that induced Zirintusa to come to the United States, and Whitaker's breach of her contractual obligations upon Zirintusa's arrival.

### The Parties

6. Plaintiff Zirintusa is a citizen of Uganda who lawfully resides in the United States pursuant to a student visa. Zirintusa currently is enrolled in Montgomery Community College in Takoma Park, Maryland ("Montgomery College"). Since being terminated by Whitaker in December 2004, Zirintusa has been staying with various friends in the Washington, D.C. area.

7. Defendant Whitaker was selected by President Clinton to be the Assistant U.S. Trade Representative for Africa in 1998. In 2001, President Bush retained her services. During her tenure with the U.S. government, Whitaker formed personal and business relationships with African leaders, including Uganda's President, Yoweri K. Museveni ("President Museveni"). Whitaker remained in her Assistant U.S. Trade Representative position until 2002, when she left

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

to found The Whitaker Group, a Washington, D.C.-based consulting firm with a focus on African development. Whitaker currently resides in the District of Columbia and is the President and CEO of The Whitaker Group.

8.   Pauline Harris ("Harris") is a personal friend of Whitaker. At Whitaker's direction, Zirintusa worked in Harris' Washington, D.C. home, typically for one 12-hour day each week that Zirintusa was in Whitaker's employ. On information and belief, Whitaker received payment from Harris for Zirintusa's services.

## Jurisdiction and Venue

9.   This Court has subject matter jurisdiction pursuant to the Fair Labor Standards Act, 21 U.S.C. § 216(b), and 28 U.S.C. § 1331 (Federal Question).

10.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over claims arising under District of Columbia law, including claims under D.C. Code § 32-1301, et seq., and D.C. Code §32-1001, et seq., as well as common law claims for breach of contract, unjust enrichment, tortious interference with contract, tortious interference with prospective advantage, and fraud.

11.  Whitaker resides in the District of Columbia and a substantial part of the events or omissions giving rise to the claim occurred within the District of Columbia.

12.  Venue is proper pursuant to 28 U.S.C. § 1391(b) and 21 U.S.C. § 216(b).

## Statement of Facts

**A.   Zirintusa Had a Good Job That Allowed Her To Support Her Family.**

13.  Zirintusa was born in Uganda in 1969. After graduating from high school, Zirintusa became a principal caretaker for her family, including her ailing, elderly mother, two of her children and five of her relatives' children. To support them, Zirintusa worked for the Uganda State House, i.e., the residence of the President of Uganda, from 1989 to 2004.

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

Zirintusa's most recent position in the Uganda State House was as a Catering Officer. In that position, Zirintusa supervised junior staff members and traveled throughout Uganda with President Museveni and his wife.

14.     As a Catering Officer, Zirintusa earned a base salary, plus a per diem sum when traveling with President Museveni. Further, Zirintusa received a benefits package, worth an estimated $2,500 per month, that included, among other things: (1) permanent housing for Zirintusa and her family; (2) health insurance for Zirintusa and her family; (3) Zirintusa's board; (4) holiday bonuses; (5) transportation and commuter allowances; (6) free use of a government car and telephone services; and (7) a scholarship for one of Zirintusa's children to attend a prestigious Ugandan private school. Zirintusa's job also afforded her intangible benefits, including reputation and status in her community.

15.     On a regular basis, Zirintusa signed renewed employment agreements with the Ugandan State House. On information and belief, the employment agreements between Zirintusa and the Uganda State House were for a term of years and Zirintusa was not an at-will employee of the Uganda State House.

**B.     Whitaker Tries To Lure Zirintusa To Washington, D.C.**

16.     In or around September 2002, Whitaker visited one of the President Museveni's country homes. When Zirintusa learned that Whitaker needed a female personal attendant, Zirintusa volunteered. Upon Whitaker's request, Zirintusa also provided other assistance and companionship to Whitaker during her visit. Whitaker commented on Zirintusa's strong work ethic and asked Zirintusa about her family in Uganda.

17.     In or about January 2003, when Whitaker returned to Uganda to visit President Museveni, Whitaker expressed to Zirintusa's superiors an interest in hiring Zirintusa to work for

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

Whitaker in Washington, D.C. Shortly thereafter, Whitaker called Zirintusa and made her an offer of employment. Zirintusa refused the offer, citing her good job in Uganda and the need to care for her family.

18. In response to Zirintusa's concerns, Whitaker made an improved offer of employment, for a period of three years, on terms that included: (1) four times the wages that Zirintusa earned in her current position; (2) full tuition at a U.S. college; (3) room, board and health care in the United States; (4) separate payments to support Zirintusa's family that would be sufficient to provide them with room, board and medical care comparable to what Zirintusa received from the Uganda State House, plus school tuition for the minor children in Zirintusa's care. Upon information and belief, Whitaker never intended to make any payments to support Zirintusa's family. Whitaker's promise to make such payments was a false statement of material fact.

19. Zirintusa did not accept Whitaker's offer of employment. In or around September 2003, during another of Whitaker's visits, Whitaker renewed her offer on the same terms. In doing so, Whitaker once again promised to make payments to support Zirintusa's family despite the fact that, on information and belief, Whitaker never intended to honor her promises. Once again, Zirintusa did not accept the offer.

C. **Whitaker Causes Zirintusa's Termination.**

20. In or around February 2004, Whitaker returned to visit the Uganda State House. Upon information and belief, Whitaker approached President Museveni and his wife to discuss Whitaker's desire to employ Zirintusa in Washington, D.C. Shortly thereafter, Zirintusa learned that President Museveni had "authorized" Zirintusa to work for Whitaker. Further, Zirintusa learned from President Museveni, who asked Zirintusa when her U.S. education would begin,

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

that President Museveni expected Zirintusa to accept Whitaker's offer of employment. Accordingly, Zirintusa understood – based on her years on President Museveni's staff and Ugandan culture – that her position with the Uganda State House was being terminated.

21. In June 2004, Zirintusa left her position with the Uganda State House pursuant to an agreement under which she would not be able to seek renewed employment there for three years, i.e., after her contract with Whitaker had been completed. A new employee filled Zirintusa's position shortly after she departed.

22. Left with little choice, Zirintusa accepted Whitaker's offer of employment on the terms that the two of them had discussed previously. In so doing, Zirintusa detrimentally and justifiably relied on Whitaker's false promises to provide support for Zirintusa's family.

### D. Whitaker Makes Arrangements for Zirintusa To Come To Washington, D.C.

23. Although Whitaker contracted for Zirintusa to work as a domestic employee, Whitaker arranged for Zirintusa to come to the United States on a student visa. Accordingly, Zirintusa, acting upon Whitaker's instructions and with Whitaker's assistance, completed an application to attend school at Montgomery College and, in June 2004, applied for a U.S. student visa with Whitaker as her sponsor.

24. In July 2004, Whitaker returned to Uganda and provided Zirintusa with funds to reimburse Zirintusa for her visa application costs. In response to Zirintusa's concerns that Whitaker had not yet provided sufficient funds to care for Zirintusa's family, Whitaker once again promised Zirintusa that upon Zirintusa's arrival in the United States, Whitaker would make separate payments to support Zirintusa's family that would be sufficient to provide them with room, board and medical care comparable to what Zirintusa had received from the Uganda State House, plus school tuition for the minor children in Zirintusa's care. These promises were false

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

statements of material fact and, upon information and belief, Whitaker had no intention of honoring them.

25. In early August 2004, reasonably relying on Whitaker's promises (including Whitaker's often-repeated but materially false representation that Whitaker would make separate payments to support Zirintusa's family), Zirintusa paid her children's tuition fees for the Fall 2004 semester and, in preparation for her impending move, gave away or sold most of her possessions at a significant loss. Moreover, she divided her family and sent them to live with various friends and relatives throughout Uganda.

### F. Zirintusa Works for Whitaker, Who Fails To Pay the Minimum Wage and Overtime Compensation and Fails To Honor Her Contractual Obligations.

26. Zirintusa worked for Whitaker in Washington, D.C. from August 18, 2004 through December 24, 2004. During this time, Zirintusa was subject to Whitaker's management, supervision and control with regard to her work.

27. On or about August 18, 2004, Zirintusa arrived in the United States and moved into Whitaker's Washington, D.C. home. The next day, Zirintusa began performing domestic tasks for Whitaker. Whitaker instructed Zirintusa about her responsibilities, which included, among other things, purchasing Whitaker's groceries (which Zirintusa did by bus), preparing Whitaker's breakfast and snacks, and cleaning the inside and outside of Whitaker's house.

28. The next week, Whitaker escorted Zirintusa to the residence of Whitaker's friend, Harris, in the Kalorama district of Washington, D.C., where Zirintusa spent 14 hours cleaning. Whitaker instructed Zirintusa that Zirintusa was required to clean Harris' house on a weekly basis. Thereafter, Zirintusa spent on average one 12-hour day each week cleaning Harris' house to Harris' exacting standards. Upon information and belief, Harris paid Whitaker for Zirintusa's services. Zirintusa never received any payments from Harris.

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

29.     Around this time, Whitaker clarified to Zirintusa that Zirintusa's salary would be $800 per month. Whitaker paid Zirintusa $400 for Zirintusa's work in the latter half of August, and subsequently paid Zirintusa between $600 and $750 per month for September, October, November and December. Whitaker explained that she was deducting the costs of Zirintusa's phone bill from Zirintusa's monthly pay, despite having represented to Zirintusa that Zirintusa was welcome to use the phone for calls to her family and without ever showing Zirintusa the phone bills. Whitaker also subtracted $100 from Zirintusa's November pay, supposedly, according to Whitaker, because Zirintusa missed a day cleaning Harris' house.

30.     During the time that Zirintusa was employed by Whitaker, Zirintusa worked 17 weeks in which she put in an estimated 60 hours per week or more – typically six 8-hour days for Whitaker plus one 12-hour day for Harris. In all, Zirintusa worked an estimated 348 hours of overtime, including an estimated 230 hours cleaning the Harris house. At no point did Whitaker pay Zirintusa any overtime compensation.

31.     Further, Whitaker failed to pay for Whitaker's board and health care. Whitaker also failed make any payments whatsoever to support Zirintusa's family, in derogation of Whitaker's contractual duty to do so.

G.     **Whitaker Terminates Zirintusa without Cause.**

32.     Shortly after Zirintusa began working for Whitaker, the relationship between the two women began to deteriorate. Zirintusa complained to Whitaker that she was unhappy with her low pay and Whitaker's refusal to honor her obligations to provide support for Zirintusa's family. Further, despite Zirintusa's long work hours, Zirintusa was attending school full time at Montgomery College, something Whitaker disliked (and pressured Zirintusa to scale back) because it cut into Zirintusa's time to perform domestic work.

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

33. On information and belief, Whitaker was concerned that once she terminated Zirintusa, Zirintusa would complain publicly about Whitaker's mistreatment or take legal action against Whitaker. Accordingly, on information and belief, Whitaker decided to create a paper record that might be helpful to Whitaker in the event that her actions were questioned.

34. On or about December 18, 2004, Sheila Williams ("Williams") – who is Whitaker's sister and Chief of Staff for The Whitaker Group – met with Zirintusa. At the meeting, Williams had Zirintusa sign a document titled "The Whitaker Group Scholarship Participation Form," stating that Zirintusa was "interested in participating in The Whitaker Group's Scholarship Program" and that was backdated to show a "Date Accepted" of April 21, 2004. In fact, however, Zirintusa did not come to the United States pursuant to a bona fide scholarship program; she came pursuant to her employment contract with Whitaker.

35. On December 24, 2004, Williams again met with Zirintusa and told Zirintusa that she was terminated, effective immediately. Whitaker did not have any cause to fire Zirintusa and Williams did not say that Zirintusa was being terminated for cause. At Williams' request, Zirintusa signed another document stating that Zirintusa declined to accept a return ticket to Uganda and a $1,500 "resettlement sum," and that Zirintusa had decided to remain in the United States and to "identify an alternative financial sponsor." Subsequently, Zirintusa received no further contractual benefits from Whitaker.

## COUNT ONE

(Violations of FLSA, 29 U.S.C. § 206)

36. Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 35 above.

37. Whitaker employed Zirintusa in a domestic services capacity. Zirintusa worked

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

for more than 8 hours in the aggregate each workweek, including work performed outside of Whitaker's household.

38. During her employment with Whitaker from August 18, 2004 through December 24, 2004, Zirintusa worked over 40 hours per week for 17 weeks, and received compensation significantly below the $5.15 per hour required by the federal minimum wage provisions.

39. As a result of Whitakers' violations, Zirintusa has suffered damages.

40. FLSA authorizes punitive damages and attorneys' fees in actions to recover minimum wage.

WHEREFORE, Zirintusa respectfully demands judgment against Whitaker and requests that the Court award damages in the amount to be proven at trial, plus liquidated damages in the equal amount, plus applicable interest, late fees, costs, and reasonable attorney's fees.

## COUNT TWO
### (Violations of FLSA, 29 U.S.C. § 207)

41. Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 35 above.

42. Zirintusa worked and resided in Whitaker's household. Zirintusa regularly worked outside of the house, including, but not limited to, cleaning the house of Harris.

43. During her employment for Whitaker, from at least August 21, 2004 until December 24, 2004, Zirintusa was a non-exempt employee of Whitaker for the purposes of § 207 of the FLSA, and therefore was entitled to overtime pay for any hours over 40 worked in a week.

44. Zirintusa worked in excess of 40 hours per week for 17 weeks during the employment period, but was never paid overtime wages.

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

45.  Whitaker was aware of Zirintusa's work schedule or reasonably should have been aware of it, and should not have permitted her to work the overtime hours without overtime compensation.

46.  Whitaker's failure to pay overtime to Zirintusa was a willful and intentional violation of the FLSA, such that Zirintusa is entitled to recover overtime pay from Whitaker for the period in question.

WHEREFORE, Zirintusa respectfully requests that the Court enter a judgment against Whitaker for violations of the FLSA, 29 U.S.C. §§ 201 et seq., and §§ 215 et seq., in the amount to be proven at trial, together with liquidated damages in an equal amount, plus prejudgment interest, plus attorney's fees and the costs of this action.

## COUNT THREE

### (Violations of D.C. Payment and Collection of Wages Law, D.C. Code. Ann., § 32-1303)

47.  Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 35 above.

48.  Whitaker failed to pay Zirintusa the outstanding wages and overtime wages to which she is entitled on the date of termination, December 24, 2004, or within 4 days from the date of termination.

49.  The failure on the part of the Whitaker to pay Zirintusa wages to which she was entitled by December 28, 2004 is a violation of the District of Columbia Payment and Collection of Wages Law, D.C. Code Ann., § 32-1303.

50.  The District of Columbia law authorizes liquidated damages, plus costs and attorney's fees for a violation of the District of Columbia Payment and Collection of Wages Law.

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

WHEREFORE, Zirintusa respectfully requests that the Court enter judgment against Whitaker in the amount to be proven at trial, plus liquidated damages in an equal amount, plus applicable interest, attorney's fees and costs of this action.

## COUNT FOUR

### (Violations of the D.C. Minimum Wage Act Revision Act of 1992, formerly D.C. Code. Ann. §§ 36.220-1 and 36.220-2 (1993))

51. Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 35 above.

52. Zirintusa worked in excess of 40 hours per week for 17 weeks during the period from August 18, 2004 to December 24, 2004, but was not paid either the D.C. minimum wage (applicable at the time) of $6.15, or the minimum overtime wage (applicable at the time) of at least $9.23 for the hours worked in excess of 40 per week.

53. Whitaker was aware or should have been aware of Zirintusa's work schedule and permitted her to work those hours.

54. Whitaker's failure to pay Zirintusa the overtime wages to which she was entitled is a violation of the District of Columbia Minimum Wage Act Revision Act of 1992, D.C. Code Ann., §§ 36.220-1 and 36.220-2 (1993), which was in force at the time.

55. Whitaker's failure to pay overtime to Zirintusa was a willful and intentional violation of the D.C. Minimum Wage Act Revision Act of 1992, such that Zirintusa is entitled to recover overtime pay from Whitaker for the employment period in question.

56. The District of Columbia authorizes liquidated damages plus costs and attorney's fees for violations set forth in this Count.

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

WHEREFORE, Zirintusa respectfully requests judgment against Whitaker in the amount to be proven at trial, plus liquidated damages in an equal amount, plus prejudgment interest, plus attorney's fees and the costs of this action.

## COUNT FIVE
### (Breach of Contract)

57. Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 35 above.

58. In 2004, Zirintusa and Whitaker entered into a three-year employment contract pursuant to which, Whitaker, for the term of the contract, was obligated to provide Zirintusa: (1) four times the wages that Zirintusa earned in her current position; (2) full tuition at a U.S. college; (3) room, board and health care in the United States; (4) separate payments to support Zirintusa's family that would be sufficient to provide them with room, board and medical care comparable to what Zirintusa received from the Uganda State House, plus school tuition for the minor children in Zirintusa's care.

59. During the time that Zirintusa worked for Whitaker, Whitaker breached the contract by failing to make payments (1) for Zirintusa's board and health care and (2) to support Zirintusa's family.

60. Subsequently, Whitaker breached the contract by terminating Zirintusa without cause before her three-year term of employment had expired, and thereafter failing to provide any contractual benefits to Zirintusa.

61. Whitaker's breaches caused Zirintusa to suffer damages.

WHEREFORE, Zirintusa respectfully requests this Court to enter judgment against Whitaker in the amount to be proven at trial, plus prejudgment interest, plus any consequential damages.

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

## COUNT SIX

### (Unjust Enrichment)

62. Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 35 above.

63. Whitaker received a benefit at Zirintusa's expense when Whitaker accepted Zirintusa's domestic services without paying Zirintusa full compensation for the value of those services.

64. Whitaker also received a benefit at Zirintusa's expense when Whitaker accepted payments from Harris for domestic services Zirintusa performed for Harris, without compensating Zirintusa for those services.

65. Under the circumstances, it would be unjust for Whitaker to retain the benefit of Zirintusa's services both to Whitaker and to Harris without paying for their full value.

66. Principles of equity therefore entitle Zirintusa to disgorge from Whitaker the benefit of the unpaid-for portion of Zirintusa's services to Whitaker, i.e., the actual value of the services Zirintusa rendered to Whitaker, measured by the D.C. minimum wage then applicable of $6.15 per hour (taking into account unpaid overtime wages then applicable of $9.23 per hour), less the amount Whitaker already paid Zirintusa for those services.

67. Principles of equity also entitle Zirintusa to disgorge from Whitaker the benefit Whitaker received from Zirintusa's services to Harris, i.e., the amount actually paid to Whitaker by Harris for Zirintusa's services to Harris.

WHEREFORE, Zirintusa respectfully requests this Court to enter judgment against Whitaker in the amount to be proven at trial, plus prejudgment interest.

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

## COUNT SEVEN

### (Tortious Interference with Contract)

68. Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 35 above.

69. Zirintusa had a contract for employment with the Uganda State House. Upon information and belief, the contract was for a term of years and was not a contract for at-will employment.

70. Whitaker knew that Zirintusa had a contract for employment with the Uganda State House.

71. Whitaker intentionally interfered with Zirintusa's contractual relationship by, on information and belief, encouraging Zirintusa's ultimate supervisor, President Museveni, to terminate her employment.

72. Whitaker's actions led to the termination of Zirintusa's employment relationship with the Uganda State House.

73. Whitaker's actions caused Zirintusa to suffer damages.

74. Whitaker's actions were willful, wanton, and malicious.

WHEREFORE, Zirintusa respectfully requests this Court to enter judgment against Whitaker in the amount to be proven at trial, plus punitive damages, plus prejudgment interest, plus attorney's fees and the costs of this action.

## COUNT EIGHT

### (Tortious Interference with Prospective Advantage)

75. Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 35 above.

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

76.  Zirintusa was in a valid business relationship with her employer, the State House of Uganda, which extended beyond her contract for employment to certain fringe benefits. Zirintusa had the expectancy of the continuation of these benefits.

77.  Whitaker knew that Zirintusa had a valid business relationship with the State House and the expectancy of continued benefits from the State House.

78.  Despite such knowledge, Whitaker intentionally interfered with this relationship and this expectancy by, on information and belief, influencing the President of Uganda to dismiss Zirintusa, thereby inducing termination of both the business relationship and the expectancy of continued benefits.

79.  Whitaker's actions caused Zirintusa to suffer damages.

80.  Whitaker's actions were willful, wanton, and malicious.

WHEREFORE, Zirintusa respectfully requests this Court to enter judgment against Whitaker in the amount to be proven at trial, plus punitive damages, plus prejudgment interest, plus attorney's fees and the costs of this action.

## COUNT NINE
### (Fraud)

81.  Zirintusa hereby realleges and incorporates by reference herein the allegations of Paragraphs 1 through 35 above.

82.  Whitaker made material misstatements of fact in January 2003, September 2003, and July 2004, when she falsely promised Zirintusa that if Zirintusa accepted Whitaker's offer of employment, Whitaker would provide payments for the care and support of Zirintusa's family in Uganda.

83.  At the time Whitaker made these misrepresentations, on information and belief, she knew that they were false and did not intend to honor her promises.

DRAFT FOR COMPROMISE NEGOTIATIONS
FED. R. EVID. 408
JULY 1, 2005

84. On information and belief, Whitaker made these misrepresentations for the purpose of inducing Zirintusa to rely upon them.

85. Zirintusa reasonably and justifiably relied on Whitaker's misstatements, sold her possessions at a significant loss, left her family in Uganda, and came to work for the Whitaker in the United States.

86. Whitaker's misstatements caused Zirintusa to suffer damages.

87. Whitaker's actions were willful, wanton, and malicious.

WHEREFORE, Zirintusa respectfully requests this Court to enter judgment against Whitaker in the amount to be proven at trial, plus punitive damages, plus prejudgment interest.

## DEMAND FOR JURY TRIAL

Zirintusa demands a jury trial as to all issues.

Dated: July 10, 2005

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

Alex C. Lakatos, Esq. (DC Bar No. 453763)
2300 N Street N.W.
Washington, DC 20037-1128
United States of America
Telephone: (202) 663-8693
Facsimile: (202) 663-8007
E-mail: Alex.Lakatos@pillsburylaw.com

Kerri Sherlock, Esq.
Break The Chain Campaign
733 15th Street NW
Washington, DC 20005
Telephone: (202) 787-5245
Facsimile: (202) 387-7915
E-mail: kerri@ips-dc.org

*Counsel for Plaintiff Idah Zirintusa*