**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| IDAH ZIRINTUSA | ) | |
| Plaintiff, | ) | Civil Action No. A:05CV01738 (EGS) |
| | ) | |
| vs. | ) | **PLAINTIFF'S REPLY TO** |
| | ) | **THE WHITAKER GROUP'S** |
| ROSA WHITAKER, et al. | ) | **OBJECTIONS TO RULE 30(b)(6)** |
| | ) | **SUBPOENA** |
| Defendants. | ) | |

Pursuant to the Court's May 2, 2007, Order, Plaintiff submits this Reply to The Whitaker Group's ("TWG") Objections to Plaintiff's Rule 30(b)(6) subpoena.

## I. Introduction

With its latest filing, TWG has twice briefed, through two separate counsel, the instant discovery dispute over TWG's refusal to answer certain questions during its 30(b)(6) deposition. Yet TWG has not once mentioned, let alone objected to, a single specific question that plaintiff posed to TWG. The reason is simple: plaintiff's questions to TWG sought highly relevant, non-privileged information, and TWG's generic objections cannot justify its refusal to answer. A party that wants to limit discovery "must establish good cause and a specific need for protection, as opposed to simply making conclusory or speculative statements." <u>Washington v. Thurgood Marshall Academy</u>, 230 F.R.D. 18 (D.D.C. 2005). Here, TWG has made no effort to cross that hurdle.

## II. Discussion

### A. TWG was deliberately obstructionist throughout its deposition.

There is little point to discovery if defense witnesses can pick and choose the questions they will answer. But that is exactly what happened here. From the start of its deposition until the end, TWG simply opted out of questions that did not favor the defendants. At the outset,

- 1 -

TWG announced that it only would answer questions relating to TWG's "Scholarship Program," and then TWG contrived reasons not to answer plaintiff's questions. Even a cursory review of the transcript (attached as Exhibit 1 to the Declaration of Alex C. Lakatos, Esq. (May 11, 2007)), reveals that TWG deliberately thwarted discovery. For example, TWG refused to answer questions that would reveal the identity of its own employees who had met the plaintiff, and hence, who might be adverse to the defendants:

> Q. Which Whitaker Group employees in 2004 met Idah?
> A. <u>I don't plan to answer</u> that since it does not tie directly to the Scholarship Program, and I can't sit here and tell you everybody that she might have met at the Whitaker Group.
> Q. How many employees in 2004 were there?
> A. I don't know. I would have to go back and check my records.
> Q. Could you give us an estimate? Is it under 10?
> A. Probably. I can't remember. It was three years ago.
> Q. Okay. Of the people you remember, which employees of The Whitaker Group met Idah in 2004?
> A. <u>Again, I'm not going to answer that</u>, because it does not tie directly to The Whitaker Group Scholarship Program, and I consider that privileged information.[1]

Even when the plaintiff asked questions about the supposed "Scholarship Program" (in part, to show that the so-called "Scholarship Program" was actually a ruse to disguise the fact that plaintiff came to the United States as an employee of the defendant, and not as a scholarship student), TWG made every effort to avoid giving any substantive answers:

> Q. Is there an account at The Whitaker Group that's relating to the Scholarship Program?
> A. Is there an account, a separate account? If you're talking about me describing the structure of The Whitaker Group's financial accounting, <u>I'm not going to respond to that</u>.
> Q. Which account at The Whitaker Group is used to write checks for The Scholarship Program?
> A. Again if you want me to respond to the accounting system for The Whitaker Group, <u>I'm not going to answer that question</u>.
> Q. I'm asking as it relates to the Scholarship Program.

---

[1] Tr. at 16:2 – 16:21 (emphasis added). <u>See also</u> Tr. 103:16 – 103:20 (same); Tr. 85:20 – 86:20 (refusing to provide last name and job duties of "Nicole," a witnesses identified in a TWG document as one of TWG's employees who had met plaintiff Idah Zirintusa).

> A. In order to answer that question, again I would have to describe the accounting system that we have at The Whitaker Group.[2]
>
> Q. Why did The Whitaker Group decide to start the Scholarship Program?
> A. … [A]re you asking information about The Whitaker Group or the Scholarship Program?
> Q. I'm asking why The Whitaker Group decided to start the Scholarship Program.
> A. Okay. If the question concerns The Whitaker Group, <u>I'm not going to respond</u> in terms of the intentions of anything like that of The Whitaker Group.
> Q. Okay. Well, the question pertains to the Scholarship Program, why it was generated.
> A. But what your asking is the intent of The Whitaker Group, you know, why the program was set up, that kind of thing, and <u>I'm not going to respond to that</u>.[3]

TWG also refused to answer basic questions about TWG's relationship with the plaintiff, and defendant Whitaker's relationship with the plaintiff, including questions central to the case such as whether the plaintiff came to the United States to work as defendant's employee (and not on a genuine scholarship program):

> Q. How did The Whitaker Group learn about Idah?
> A. Okay, are you asking about The Whitaker Group, the Company?
> Q. Yes.
> A. Okay. I'm not going to – <u>I cannot answer anything that relates to The Whitaker Group.</u>
> Q. Okay. How did you first learn about Idah?
> A. As related to the scholarship program?
> Q. No, just how did you – generally how did you first learn about Idah?
> A. Again, if it pertains to the Scholarship Program, I will answer that information for you.
> Q. Okay, and what is the basis for not answering the question I just posed?
> A. As I stated when we first started, I would respond to issues and questions surrounding the scholarship program.[4]
>
> Q. Did you ever speak with Rosa Whitaker about how she met Idah?
> A. Again, if it's not to do with the Scholarship Program, you know, <u>I'm not going to answer</u> anything that's not related to The Scholarship Program.
> Q. <u>Did you ever speak with Rosa about Idah working?</u>

---

[2] Tr. at 23:13 – 24:13 (emphasis added).
[3] Tr. at 27:11 – 28:6 (emphasis added).
[4] Tr. 61:13 – 62:4 (emphasis added).

A.  Again, if its not related to the Scholarship Program, <u>I'm not going to answer</u> any of those questions.[5]

In all, Ms. Williams, with her counsel's support, refused to answer dozens of questions on numerous topics including: (1) TWG's document retention policy;[6] (2) Ms. Whitaker's position, duties, hours, and assistants (that bear on Ms. Whitaker's need to hire plaintiff as a domestic worker);[7] and (3) Ms. Williams' background, biases and qualifications to testify.[8] All of these questions sought relevant, non-privileged information.

### B. The objections that TWG filed with the court are inapposite.

The objections that TWG filed with the Court on May 1, 2007, are generic and inapplicable to the specific questions that TWG refused to answer at deposition. TWG's objections focus on (1) relevance/overbreadth; (2) undue burden/harassment; (3) privacy; and (4) proprietary information. None of these objections is valid here.

#### 1. Relevance

In general, a party is entitled to discover information if such information is "relevant" or if it appears "reasonably calculated to lead to the discovery of admissible information." Fed. R. Civ. P. ¶ 26(b)(1). Plaintiff's questions easily satisfy this standard.

First, TWG is wrong that the identity of the witnesses that plaintiff sought to discover is not relevant. <u>See</u> Fed. R. Civ. P. ¶ 26(b)(1) ("Parties may discover … the identity and location of persons having knowledge of any discoverable matter.") Plaintiff asked about the identity of the persons who met the plaintiff, who worked for TWG, and who may be able to testify that, among other things, (1) plaintiff came to the United States to work for defendant Whitaker; (2) plaintiff did not come the United States pursuant to a <u>bona fide</u> scholarship program; and

---

[5] Tr. 73:7 – 73:16 (emphasis added).; <u>see also</u> Tr. 66:22 – 67:10.
[6] Tr. 19:16 – 19:19.
[7] Tr. 24:18 – 25:1; 188:18 – 189:19.
[8] Tr. 186:12 – 188:17; 194:9 – 196:9.

(3) defendant Whitaker made admissions against her interest concerning the work that plaintiff performed.  Plaintiff also asked for the identity of TWG's bookkeeper and accountants,[9] who similarly might be able to testify to whether a valid scholarship program existed, among other things.  TWG refused to provide the identity of any of these witnesses, and plaintiff cannot find them on her own.  Courts have recognized that concealing a potentially helpful witnesses is improper conduct that can subject the withholding party to sanctions.  See Bonds v. District of Columbia, 93 F.3d 801 (D.C. Cir. 1996) (discussing appropriate sanction to impose on the District for failing to provide names of all persons with knowledge of relevant events in a timely fashion).

Second, TWG is wrong that questions about the relationship between TWG and the plaintiff, and the relationship between defendant Whitaker and the plaintiff, are not relevant. The central dispute in this case is whether the plaintiff came to the United States to work for defendant Whitaker pursuant to an employment contract (as plaintiff maintains), or whether plaintiff came to the United States pursuant to a purported "scholarship program" and did no domestic work while she was here (as defendant Whitaker tries to argue).  Accordingly, questions about why plaintiff came here and whether she worked while she was here (e.g., How did The Whitaker Group learn about Idah?[10]  Did you ever speak with [Defendant] Rosa [Whitaker] about [plaintiff] Idah [Zirintusa] working?[11]  With whom did Rosa communicate that she was going to pay room and board in connection with the scholarship program?[12]) that TWG refused to answer, are highly relevant.  Likewise, questions designed to test the legitimacy of the scholarship program (e.g., Is there an account at The Whitaker Group that's relating to the

---

[9] Tr. at 22:7 – 22:16.h
[10] Tr. at 61:13 – 61:18.
[11] Tr. at 73:12 – 73:16.
[12] Tr. at 127:5 – 129:2.

Scholarship Program?[13] Why did The Whitaker Group decide to start the Scholarship Program?[14]) that TWG also refused to answer are of vital importance.

Third, TWG is wrong that the hours that defendant Whitaker spent working for TWG, and Ms. Whitaker's job duties, are irrelevant. Because the plaintiff intends to prove that she performed domestic work for Ms. Whitaker, and because Ms. Whitaker denies that fact, trial in this matter will be largely a credibility contest between Ms. Whitaker and Ms. Zirintusa. Accordingly, Ms. Zirintusa will buttress her position by demonstrating that Ms. Whitaker's hours, travel, and job duties necessitated the domestic help that the plaintiff provided to Ms. Whitaker. Ms. Zirintusa tried to gather this information by asking questions such as: Who is Rosa Whitaker in relation to The Whitaker Group?[15] How many hours per day does Ms. Whitaker work?[16] Does Ms. Whitaker typically work late hours?[17] and Does Ms. Whitaker have a personal assistant?[18] TWG unilaterally refused to answer each of these questions.

Similarly, TWG is wrong that questions bearing on the background, biases, and qualifications to testify of its designated witness (Sheila Williams, who is defendant Whitaker's sister) are not relevant. Questions in this area (<u>e.g.</u>, How long have you been at The Whitaker Group?[19] Is Rosa Whitaker your sister?[20] What are your duties as Chief Operating Officer?[21]) that TWG refused to answer are important because the jury may be called upon to evaluate Ms. Williams's credibility and to understand the basis for her testimony.

Finally, questions about TWG's efforts to search for documents in response to plaintiffs' subpoena, and its document retention policies (<u>e.g.</u>, Did you check, when you were responding to

---

[13] Tr. at 23:13 – 24:13.
[14] Tr. at 27:11 – 28:6.
[15] Tr. at 24:19 – 25:2.
[16] Tr. at 188:21 – 188:22.
[17] Tr. at 189:7 – 189:8.
[18] Tr. at 189:18 – 189:19.
[19] Tr. at 186:12 – 186:19.
[20] Tr. at 187:5 – 187:7.
[21] Tr. at 186:20 – 187:4.

the subpoena, for records of wire transfers in relation to the Scholarship Program?[22]  Does The Whitaker Group have a policy concerning the retention of documents?[23]) that TWG refused to answer are relevant for plaintiff to ensure that received the documents she subpoenaed and to understand what TWG might have destroyed, whether deliberately or inadvertently.

### 2. Undue Burden

TWG's undue burden objections make little sense in the context of a deposition.  There is nothing difficult or burdensome involved in requiring TWG's witness to respond to questions to which she knows (or through minimal preparation, could learn) the answer.  TWG cynically asserts that it is a "non-party," that should be shielded from the "burden" of answering questions in this litigation, but in fact, TWG is named for, founded by, and appears to be owned and controlled by defendant Whitaker.  Indeed, TWG's close connection with defendant Whitaker is the best explanation for why it refused to answer so many questions.  Nor should this Court hear TWG's disingenuous protest that it should not be compelled to give answers because it already has sat once for "seven hour" deposition – TWG, and TWG alone, bears responsibility for prolonging the deposition by refusing to answer key questions.

### 3. "Privacy"

TWG objects that it should not be required to answer any questions on subjects that it claims would implicate its employees' or former employees' "privacy."  But as the court held in Washington, 230 F.R.D. at 21 (on which TWG relies), a party seeking to avoid production of documents on the ground that their production would reveal "private" information "has a heavy burden of showing 'extraordinary circumstances' based on 'specific facts' that would justify such an order."  Here, TWG has not made any such showing; it has done nothing more than invoke the word "privacy."

---

[22] Tr. at 56:1 – 56:9.
[23] Tr. at 19:16 – 19:19.

This is hardly surprising, because the questions that TWG refused to answer did not seek any information that fairly could be characterized a the type of highly private materials (e.g., medical history) that would implicate any privacy concerns. Even in Washington, where genuine privacy interests were at stake because the discovery related to the treatment of disabled workers, the court did not preclude the discovery on privacy grounds. Instead, the court issued an order limiting the use of the discovery sought to the instant case. Id. at 22-24.[24]

### 4. "Proprietary Information"

TWG's final objection is that it should not be required to produce certain information it deems "proprietary." As a general rule, a party can discovery any evidence that is relevant and that is not privileged. Fed. R. Civ. P. 26(b)(1). TWG does not cite any authority for the proposition that its "proprietary" information is privileged, and plaintiff is not aware of any. Accordingly, this is not a sound basis to withhold the discovery sought.

### C. TWG's failure to answer questions at deposition is sanctionable

Under the Federal Rules, an attorney "may instruct a deponent not to answer only when necessary to preserve a privilege" or in certain other limited circumstances. Fed. R. Civ. P. 30(d)(1). Attorneys who instruct their clients not to answer without any grounds, as TWG's attorney did here,[25] may be subject to sanctions.[26] Likewise, a party that simply refuses to answer questions also appropriately is subject to sanctions. In Minebea Co., Ltd. v. Papst, 355 F.Supp.2d 526, 530 (D.D.C. 2005) (emphasis added), the court explained: "Although refusal to

---

[24] As an alternative to denying the plaintiff access this highly relevant information, if the Court is persuaded that there are genuine privacy concerns at stake here (and plaintiff does not believe that there are), plaintiff would be willing to enter into a reasonable protective order that will keep any such information sealed but that would allow plaintiff the information necessary to prove her case.
[25] Tr. at 17:5 – 19:3.
[26] Jackson v. City of New York, No. 02 Civ. 8909KMW, 2005 WL 1705172, at *2 (S.D.N.Y. July 20, 2005) ("Directions not to answer questions at depositions are extremely disruptive, and form a large part of the disputes brought to the Court. Many lawyers appear to be unaware of, or determined to disregard, the specific dictates of Rule 30(d)(1), perhaps in the hope that they will be able to later convince the Court that the area of inquiry was irrelevant under Rule 26. This is not an attitude to be encouraged."); Jones v. J.C. Penney's Department Stores, Inc., 228 F.R.D. 190 (W.D.N.Y. 2005) (imposing sanctions on attorney who instructed client not to answer question without any privilege-based reason for doing so).

answer on legitimate grounds of privilege is appropriate, stonewalling will not be tolerated by the Court.  <u>Should it appear that either party is</u> improperly claiming privilege, <u>being evasive or non-responsive, or refusing fully to participate in discovery, the Court will impose sanctions</u>."

### D.    TWG's objections to the production of documents also are unfounded

TWG objections to plaintiff's reasonable document requests are also unfounded.

#### 1.    Scholarship Program documents

The first document request in plaintiff's subpoena seeks documents concerning the institution and administration of the "Scholarship Program," and the second document request seeks documents concerning applicants, participants and beneficiaries of the "Scholarship Program."  Incredibly, TWG objects that such documents are irrelevant, despite that fact that the Scholarship Program was the only subject on which TWG deigned to answer questions at its deposition, and despite the fact that the legitimacy of the "Scholarship Program" is a central issue in this litigation.  TWG also objects on grounds of the "privacy" of the "Scholarship Program" participants, but once again, does not articulate an injury that will occur to such persons if their names and locations are revealed, as it must to meet the standard to avoid disclosure of such information.  TWG next objects that these requests are overbroad, but does not suggest any compromise (<u>e.g.</u>, the production be limited to a year before, and year after, the time when plaintiff was working for Ms. Whitaker); instead, it seeks improperly to avoid discovery entirely.  Finally, TWG objects that producing the documents will be burdensome, but does not say why this will be so.  This laundry list of generalized objections should not be sufficient to avoid production of the easily obtainable, clearly relevant materials sought.

#### 2.    Documents concerning plaintiff's visits to TWG

The sixth document request in plaintiff's subpoena seeks documents concerning plaintiff's visits to TWG's offices.  Once again, TWG provides the same list of generic

objections. But, plainly, records of plaintiff's visits to TWG's offices are likely to reveal both the names of witnesses who met the plaintiff and the plaintiff's reasons for being in TWG's offices that, in turn, will help show that plaintiff was present in the United States to work for defendant Whitaker, and not on a bona fide scholarship program. There is no sound basis for TWG to withhold these documents.

### 3. Documents concerning the plaintiff

Plaintiff's eighth document request is for TWG documents that specifically concern the plaintiff. TWG objects that the request is overbroad and unduly burdensome. However, as the entire relationship between plaintiff and TWG is at issue, the request is not overbroad. Nor does TWG explain how or why it would be burdensome to produce such documents.

### 4. Documents concerning service of process on defendant Whitaker

Plaintiff's tenth document request seeks documents concerning communications between Capitol Process Servers (the agent of the court that served defendant Whitaker) and TWG. TWG objects that this material is not relevant or calculated to lead to admissible evidence; however, defendant Whitaker's extraordinary efforts to evade process in this matter that included a hit-and-run assault on a process server are highly relevant to this dispute, as they demonstrate that Ms. Whitaker believed that plaintiff's claims were well founded and gave rise to genuine concerns about liability.

### 5. Documents concerning defendant Whitaker's travel

Plaintiff's eleventh request seeks documents concerning defendant Whitaker's travel from July 2004 through January 2005, and from August through October 2005. This information is relevant to understanding Ms. Whitaker's travel at the time she met the plaintiff in Uganda and to understanding the demands on Ms. Whitaker's schedule that necessitated hiring the plaintiff as a domestic worker. Although TWG suggests that producing these documents would be unduly

burdensome, it does not say why this would be so, and although TWG protests that the documents are better obtained elsewhere, the fact is that TWG, as defendant Whitaker's business, is the most natural repository for records of her business travel.

### III.   Request for Relief

In sum, TWG had no basis for refusing to answer plaintiff's questions during its deposition, and no basis for withholding the documents discussed above. Accordingly, plaintiff respectfully requests that this Court order the TWG (1) appear for deposition in order to answer questions on the topics it refused to address at its initial deposition; (2) pay costs and fees associated with the need to conduct the additional deposition and filing this motion; and (3) produce documents responsive to the requests discussed above.

Dated: May 11, 2007                                Respectfully submitted,

                                                    MAYER, BROWN, ROWE & MAW LLP


                                                     /s/ Alex Lakatos_____
                                                    Alex C. Lakatos, Esq. (DC Bar No. 453763)
                                                    1909 K Street, NW
                                                    Washington, DC 20006